**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**DIVISION FOUR**

| | |
|---|---|
| **IN RE: Dividend Solar Finance, LLC and Fifth Third Bank Sales and Lending Practices Litigation** | **MDL No. 24-3128 (KMM/DTS)** |
| | **DIRECT FILED COMPLAINT & JURY DEMAND PURSUANT TO MDL ORDER NO. 5** |
| This Document Relates to: | |
| Commonwealth of Virginia ex rel. Jay Jones, Attorney General, | CIVIL ACTION NO. |
| Plaintiff, | |
| vs. | |
| Fifth Third Bank, a National Association, successor by merger of Dividend Solar Finance LLC | |
| Defendant. | |

## I. SUMMARY

1.       The federal Consumer Financial Protection Act and the Virginia Consumer Protection Act prohibit deception by those engaged in consumer lending.  Partnering with solar installation company, Power Home Solar, LLC, Defendant deceived over 500 Virginia consumers into taking out over $30 million in loans to purchase high-priced solar systems by claiming consumers would save consumers enough money to afford the loans needed to buy them, when, in fact, Defendant knew loan holders would lose money initially and for years to come.

1

2.     The Consumer Financial Protection Act prohibits regulated entities from violating the Truth in Lending Act, which requires disclosure of consumer loan fees.  Defendant charged hidden loan fees of 15-16%, pretending the fees were part of the solar system costs, when they were not.

3.     Hiding loan fees was also a deceptive practice under the federal Consumer Financial Protection Act and the Virginia Consumer Protection Act.

## II. PARTIES, AUTHORITY AND REQUIRED NOTICES

### A.  Plaintiff

4.     The Plaintiff is the Commonwealth of Virginia by and through Attorney General Jay Jones.

### B.  Plaintiff's Authority to Bring Federal and State Claims

5.     The Plaintiff has authority to bring this action under the Consumer Financial Protection Act of 2010, 12 U.S.C §§ 5536(a)(1)(A)-(B), 5552, and 5565(b), which authorizes state Attorneys General to bring actions for deceptive loan practices and actions for violations of other federal consumer financial laws, including the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*., and its implementing regulations.  The Virginia Consumer Protection Act, Virginia Code § 59.1-196 *et seq*. additionally authorizes the Attorney General to bring this action.

### C.  Defendant

6.     Fifth Third Bank is a National Association with its headquarters and principal place of business at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  By merger it is the successor of Dividend Solar Finance LLC, whose conduct is at issue here.  All references to "Defendant" or "Dividend" apply to Fifth Third Bank as Dividend's successor by merger.

**D.  Reasons for Nonjoinder of Power Home Solar, LLC**

7.     Power Home was a Delaware limited liability company whose headquarters and principal place of business were in Mooresville, North Carolina.  It filed for Chapter 7 bankruptcy on October 7, 2022.  The bankruptcy proceeding, *In re: Power Home Solar, LLC, No. 22-50228* (Bankr. W.D.N.C.), is still pending. Further, as Power Home is subject to the Bankruptcy Court's jurisdiction and protections, naming Power Home in this action could subject it to incurring obligations that are multiple or inconsistent with the bankruptcy proceeding. Moreover, the Defendant in this case can provide the complete relief sought by the Plaintiff, including the relief described below.

**E.  Relief Sought**

8.     As authorized by 12 U.S.C. § 5565(a)(1) and Virginia Code §§ 59.1-203, 59.1-205, and 59.1-206, Plaintiff seeks permanent injunctive relief, contract rescission or reformation, restitution, disgorgement or compensation for unjust enrichment, payment of damages or other monetary relief, public notification regarding the violation, including the costs of notification, civil penalties, attorneys' fees, expenses, and other equitable and statutory relief for Defendant's violations of federal and state consumer protection laws.

**F.  Notices to Defendant Under State Law**

9.     In accordance with Virginia Code § 59.1-203(B), the Plaintiff gave Defendant written notice these proceedings were contemplated and provided it a reasonable opportunity to appear before the Office of the Attorney General to demonstrate that no Virginia Consumer Protection Act violations had occurred, or, in the alternative, to execute an appropriate Assurance of Voluntary Compliance.  Defendant appeared, but did not show that no violations had occurred, and did not execute an appropriate Assurance of Voluntary Compliance.

3

**G.  Notice to Consumer Financial Protection Bureau under Federal Law**

10.      In accordance with 12 U.S.C. § 5552(b)(1) and 12 C.F.R. § 1082.1, the Plaintiff gave notice to the Consumer Financial Protection Bureau before commencing this action.

## III. JURISDICTION AND VENUE

**A. Personal Jurisdiction**

11.      The Plaintiff's Designated Forum – the district court in which the Plaintiff would have otherwise filed this case but for this Multidistrict proceeding (MDL) – is the Eastern District of Virginia, Richmond Division.

12.      As detailed in this Complaint, the Plaintiff's Designated Forum has personal jurisdiction because Dividend conducted business in Virginia by extending loans to purchase solar systems to over 500 Virginia households, including dozens in the Eastern District of Virginia.

**B.  Subject Matter Jurisdiction**

13.      The Plaintiff's Designated Forum and this MDL have subject matter jurisdiction under 28 U.S.C. § 1331 for claims brought under the Consumer Financial Protection Act, 12 U.S.C. § 5536(a).

**C.  Supplemental Jurisdiction**

14.      The Plaintiff's Designated Forum and this MDL have supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear actions enforcing state consumer protection laws. As described herein and in Counts I, II, III, and IV the state consumer protection claims for deceptive conduct arise out of the same facts and transactions as the federal Consumer Financial Protection Act claims and have similar legal elements.

**D.  Venue**

15.    Venue is proper in the Plaintiff's Designated Forum under 28 U.S.C. § 1391(b)(2) because, as set forth in this Complaint, including section III.A above, the Plaintiff's Designated Forum is where a substantial part of the events giving rise to the Plaintiff's claims occurred.

16.    Venue is also permissible in the Plaintiff's Designated Forum for the Plaintiff's claims under the Consumer Financial Protection Act, 12 U.S.C. § 5564(f), whose permissive venue provision provides, "the attorney general . . . of any State may bring a civil action in the name of such state in any district court of the United States in that state."

**E.  Tolling Agreements**

17.    Defendant has a tolling agreement with the Plaintiff, under which Defendant agreed to toll any statute of limitation and any other time-related defenses for the claims brought in this Complaint for the tolling agreement's effective period.

18.     The tolling agreement, with extensions, was in effect from March 28, 2023 to January 16, 2026, at which point it terminated when the Plaintiff filed a complaint against Defendant in the Plaintiff's Designated Forum.

### IV. FACTS I OF II: DECEPTIVE ADVERTISING, MARKETING, AND SALES USED TO SELL SOLAR SYSTEMS AND LOANS

**A. Dividend's Loans Help Fuel Power Home's Residential Solar Sales.**

19.    From 2014 until it filed for Chapter 7 bankruptcy in October 2022, Power Home advertised, offered for sale, sold, and installed residential solar and energy efficiency products in Virginia and other states.

20.    Specifically, it sold, installed, and repaired solar panels, solar batteries, inverters, electrical panels, and insulation, all for residential use.

21.     Power Home's average solar system and installation price rose to over $64,000 in 2021 and 2022, even as solar equipment prices decreased market wide.

22.     As sales and prices increased, so did Power Home's need for consumer loans.

23.     From 2021 to Power Home's Bankruptcy in 2022, Dividend financed Power Home's sales by making loans to residential homeowners.

24.     In Virginia, Power Home sold around 530 residential solar systems that were financed by Dividend loans.

25.     Dividend's Virginia loans were for 25-year terms.

26.     These long-term loans were the product of deceptive advertising, marketing, and sales, contained hidden fees, and have harmed and continue to harm consumers in Virginia, among numerous other states.

**B. Dividend Delegated Advertising, Marketing, and Selling of its Loans to Power Home, Subject to the Its Control**

27.     In return for loan funding, Power Home acquired loan consumers for Dividend.

28.     Dividend had a contract – a "Solar Finance Program Agreement" – with Power Home that it executed in May 2021.

29.     Dividend also required Power Home to conform to its "Solar Financing Program Agreement Instructions and Procedures."

30.     The Program Agreement and Instructions delegated advertising, marketing, promotion, and sales of the systems and loans to Power Home subject to Dividend's control.

31.     The Program Agreement and Instructions provided Dividend could

- Obtain, review, and audit Power Home's advertising, marketing, and sales materials (especially sales proposals described further below).
- Require advertising, marketing, and sales materials to meet lender-set standards.
- Approve and reject those materials.

- Train and direct sales representatives about loan applications, loan disclosures and terms, and loan agreements.
- Participate in Power Home's sales and marketing trainings.
- Obtain consumer-specific materials like electric bills.
- Review consumer complaints and complaint resolution processes and responses.
- Set standards for pricing, installation timelines, warranties, and loan disbursements.

32.     With the Program Agreement in place, Dividend did not need to (and generally did not) conduct its own advertising, marketing, or sales of its solar loans to Virginia consumers; it used Power Home to do so.

33.     Consistent with its Program Agreement, in practice, Dividend relied on Power Home to advertise, market, and sell its loans.

34.     Dividend also delegated its credit application, loan application, and loan execution process to Power Home's salespeople, subject to its control.

35.     Dividend authorized Power Home's salespeople to

- collect consumers' credit application information;
- enter or help consumers enter their credit applications into salespeople's' tablets;
- receive notice that Dividend had approved a consumers' credit application;
- explain loan terms, including prices, rates, fees, term, amortization, and disclosures;
- explain and review loan agreements; and
- have consumers sign the loan agreements in the salespeople's presence.

36.     Conversely, Dividend avoided having its employees talk to consumers until after the consumers signed the loan agreements.

37.     These policies were intended to allow Power Home to make more sales.

38.     Dividend touted to Power Home in an October 2020 presentation and in a May 2021 deal proposal that it generally would conduct "no welcome call," meaning it would not call consumers before its loan contracts were signed.

39.     A February 2021 Dividend pitch deck to Power Home touted that Dividend had a policy of conducting "Welcome Calls" on less than "2% of all deals," just for elderly borrowers and "jumbo loans" of more than $130,000.

40.     Dividend also recommended that when welcome calls did occur, Power Home salespeople should be present in the home during the call.

41.     Altogether, this policy of avoiding talking to consumers pre-sale permitted Power Home to deceptively pitch its systems and Dividend's loans.

**C.  The Core Deception: A Loan-Funded Solar System Saves You Money**

42.     The marketing and sale of solar loans and systems relied on a core deception: loan-backed solar purchases would save the consumers money compared to their current power bill.

**D.  The Reality: Few Customers Would Save or Did Save Money from Day One – They Would Lose Money Initially and for Years to Come**

43.     The reality differed from the messaging: consumers could not, would not, and were not saving money from day one, saving money every year, putting money in their pockets, or replacing their current bill with lower bills.

44.     Dividend had multiple ways it knew consumers faced or had money losing purchases.

45.     First, it knew these were money-losing purchases because Power Home's system prices and the resulting loan amounts were far higher than normal.

46.     The solar industry gauges prices by a solar system's price per watt.

47.     Power Home's prices per watt were "incredibly high," in the words of Dividend's managers when conducting due diligence in 2021.

8

48.     Dividend raised its own maximum price limits for solar systems to win Power Home's business.

49.     For instance, to solicit Power Home's business in May to June 2021, Dividend's managers discussed whether to allow Power Home to "go around" Dividend's industry-wide $6 per watt price limit. They decided to allow Power Home to "operate above" that limit, so long as it sold batteries with the solar system and loan.

50.     In a June 2021 Zoom meeting, Dividend's managers told Power Home's sales managers that, "We've essentially eliminated a lot of the standard rail guards we sometimes put in place as far as [price] caps and things of the nature, so Power Home is pretty much going to have free rein in that regard."

51.     Dividend eliminated its "standard rail guards," because it wanted Power Home's loan-generating business.

52.     Higher prices led to larger loan amounts.

53.     Higher loan amounts increased consumer loan default risks by increasing monthly and total payments.

54.     In turn, higher loan amounts meant consumers would and did lose money because their loan payments would exceed their solar production and energy savings.

**E.  Battery Sales Drove Prices and Loan Amounts Higher**

55.     Battery sales drove prices and loan amounts higher.

56.     Residential solar systems do not require batteries to operate; they are optional.

57.     Batteries are even less necessary for households with reliable power, with existing generators, with utilities that allowed the sale of excess electricity back to the power grid, or with no place to properly install batteries – yet, after 2020, Power Home sold them to almost everyone.

9

58.    Dividend knew that expensive batteries would mean less savings and greater costs for consumers.

59.    Dividend encouraged battery sales by telling Power Home's sales managers that if batteries were not included with the purchase and loan, Dividend would not approve the loan because otherwise the price was too high.

60.    So all of Dividend's loans in Virginia to Power Home consumers were 25-year loans for solar plus battery sales.

**F.  Hidden Loan Fees Drove Prices Higher**

61.    Dividend's hidden loan fees drove solar system prices and loan amounts even higher as described in section V below.

**G.  Advertising Emphasized Savings and No Costs to Consumers While Omitting Actual Loan Costs and Terms**

62.    Power Home's investor presentations described advertising as a "digital marketing and sales engine" whose purpose was "to drive consumer acquisition" for both Power Home and Dividend and other lenders.

63.    Advertisements claimed <u>savings</u>, including these social media advertising claims:

- "start saving money on your very first electric bill,"
- "may save thousands on their electric bills,"
- "could save money on their electric bills,"
- "[c]Ould Save Money in 2021 By Going Solar for $0 Down."
- "Reduce your electric bill & save THOUSANDS!"
- "Save THOUSANDS with reduced energy costs,"
- "Solar allows you to OWN your power and reduce your energy bill helping you save thousands with reduced energy costs."

64.    Advertisements also <u>minimized solar's costs</u>: consumers could "get" or "go" solar with "$0 Down," "$0 out of pocket," "$0 at install," "nothing out of pocket at install," "nothing out of pocket to get started," "nothing out of pocket," or "without using their own money."

10

65.    Advertisements also claimed consumers could "<u>get paid</u>" cashback, "get $2,000 Cash Back," get "$2,000 cash," get "covered for 12 months," "get cash in your pocket," or "We'll Pay You to Go Solar."

66.    For example, the social media ad below claimed savings, minimal cost, and cash back claims: "We'll pay you $2,000 and install solar & battery for $0 out of pocket.  Get paid to save money on your electric bill.  Click below to see how much you can save . . . ."



67.     Similarly, the social media ads below claimed Virginia consumers could "know you have less bills to worry about and more money going into your pocket" or could "go solar without using their own money, while saving thousands at the same time."

 

68.     Likewise, search engine advertisements claimed, "No Initial Cost Solar," "No Cost at Install & Get 12 Months on Us," "Get Paid Over $2K | After Install," "Go Solar for $0 Down + Get Over $2,039 Cash Back After Install."

69.     Advertisements generally did not indicate that solar purchases actually cost thousands of dollars, involved loans, involved loan fees, or risked losses.

70.     A few advertisements hinted that consumers would need to take out a loan, but this hint appeared only in disclaimers written in miniscule font, unreadable to ordinary readers on

typical devices.   For example, the red arrow added to the advertisement below points to the unreadable sentence: "You are still responsible for paying a monthly loan to your lender."



71. The advertisements could have – but did not – legibly disclosed the solar systems' prices or price ranges, that loans were used, that loans could take years to pay off, that consumers could lose money, or that loans could affect home value or resale.

72. Virginians taking out solar loans with Dividend for Power Home purchases saw and responded to the advertising content shown here or to similar content.

**H. Website and Landing Pages Emphasized Savings and No Cost to the Consumer**

73. Responding to online advertisements routed consumers to Power Home's webpages, a fillable form, or a "landing page."

74. These forms and pages emphasized savings and the lack of cost to the consumer.

75. A 2021 landing page made "no cost" claims, stating, "Take our 30-Second Solar Survey to See if You Qualify for USA Made Solar Panels + Generac Battery for **NO COST** At Install PLUS Get Paid Over $2,039 Bonus After Install."

76. The website page likewise claimed:

- "Get an Entire Year of Solar on Us!"
- "Get a GENERAC Battery & Solar System for $0 Down."
- "We'll cover your first year's payment."

77. The landing, form fill, and website pages did not disclose actual costs, loans, or that consumers would be taking on debt or risk of losses.

78. Virginians taking out solar loans with Dividend for Power Home purchases saw the website or used form fill and landing pages.

**I. Advertising Falsely Implied Consumers Qualified for a Federal Tax Credit**

79. Power Home's advertisements often included a claim that consumers could "Click below to determine if your home qualifies" for a federal tax credit.

80.    Here are examples of such advertisements claiming, "homeowners who qualify may receive a 26% tax credit" and "click" to qualify:

 

81.    Clicking the advertisement took the consumer to a page where they went through a qualification process.

82.     But the qualification process was not for the tax credit; instead, it just checked if the consumer met Power Home's own sales criteria, not the actual criteria for receiving the advertised "26% Federal Tax Credit."

83.     So the qualification process misled consumers about their eligibility for and likelihood of receiving the tax credit.

84.     Virginians taking out solar loans with Dividend for Power Home purchases saw and responded to advertising content shown here regarding the tax credit or to similar content.

**J.  Dividend Authorized the Advertising and Marketing Alleged Here**

85.     Dividend authorized Power Home to solicit, market, or initiate leads for its loan agreements, including by the advertising, web site, landing, and form fill pages shown above.

**K.  The Call Center "Nurtured" and Pitched Clients Brought in By Advertising, Telling them Solar Was a "Win-Win" with "$0 Down."**

86.     The call center's job was to convert advertising leads into sales appointments.

87.     With advertising generating interest from hundreds of thousands of consumers, the call center was a key part of the marketing operation.

88.     Power Home measured and graded call center employees on their "conversion percentage," how successful they were in persuading consumers who saw advertising to agree to sales meetings.

89.     The call center employees used scripts.

90.     The scripts claimed solar systems would cost consumers less than their current bills.

91.     For example, from at least 2020 through October 2022, call center employees were trained to tell consumers that any money that they might spend on solar was money that they would have spent on utility bills: "So that's the thing… with our zero down program you don't have to

pay anything out of pocket… and the best part is the monthly solar payment… you're already paying for it… (who is your power company again?) …so instead of paying them that payment, you'll pay a solar payment and you'll end up saving thousands over time."

92.   In 2021, scripts trained and instructed call center employees to emphasize cost savings by saying the following:

- "So just out of curiosity, what got you interested in solar, was it like most, you heard about our $0 down program and wanted to see how much money you can save? Great! I can't wait for you to see how much you're going to save!"

- "It's a zero-down program, no surprises, I promise! It's literally a no brainer"

- To ask for utility bill information "so we can show you exactly what your cost-savings will be"

- "Now is that your gas and electric bill combined, or just your electric? Wow . . . you should definitely save some money there!" [underline in original]

- "But I promise, no, I GUARANTEE you're gonna be super impressed with everything after they show you how you'll save thousands. Let's just get them out to show you everything and if it doesn't make sense, no harm done. At least you'll have the information and you'll know what you can save by going solar."

93.   Likewise, from April 2021 through October 2022, scripts trained and instructed call center employees to emphasize cost savings and tell consumers solar was a "WIN-WIN."

94.   Together, these scripts repeatedly mentioned saving money with definitive language like "exactly," "promise," "definitely," "no brainer," "Win-Win," and "guarantee."

95.   Conversely, from 2021 through October 2022, Power Home discouraged call center employees from disclosing, discussing, or mentioning that solar systems cost money, the amount they cost, that purchases generally involved loans, or any of the terms of the loans.

96.   Their sales trainers and written training materials told them, "You don't ever have to talk about numbers, specifics, or details. That is exactly what we are getting them set up for."

97.     If consumers hesitated or expressed doubt, call center employees were trained to use talking points called "Rebuttals."

98.     Rebuttals included the following talking points:

- "Listen, if someone told me that I could save thousands on a bill that never goes away just by letting someone come out to give me a price, I'd do it in a heartbeat. It would be crazy not to - total no brainer."
- "This is the one time where buying something will SAVE you money and lower your bills instead of costing you more. It's a no brainer."

99.     These rebuttal talking points emphasized that solar purchases were a "no brainer," because its costs would be less than current bills – buying it would "SAVE you money and lower your bills instead."

100.    Savings claims continued as the call center asked probing questions.  For instance, when asking the consumer what their average utility bill is each month, call center staff were trained to restate that amount and say "Per month?! Now is that your gas and electric bill combined, or just your electric? Wow! We should be able to help you."

101.    Call center scripts also told consumers about a federal tax credit.

102.    From at least April 2021 through October 2022, their scripts said the following or something similar: "So right now there's a large federal tax credit that may be available for going solar if you are eligible — it is impacted by your income, would you say your combined household income is at least $40k or higher? <Wait for Lead Response> Got it!"

103.    This tax credit script implied that consumers with a combined income of more than $40,000 would receive the federal tax credit if they purchased solar.

104.    Call center scripts were read to tens of thousands of potential Virginia purchasers and thousands of actual purchasers.

18

**L.  Between the Call and the Sales Meeting, Texts Emphasized Savings**

105.    After the call center scheduled meetings, Power Home sent consumers text messages.

106.    As shown below, these messages discussed "helping you save thousands," "how much you might be able to save," and claimed a "solar expert" (actually just a salesperson) would make a "personalized savings assessment."

19



107. These text messages indicated that the loan-backed solar purchases would produce savings; conversely, they gave no indication of the actual price, cost, value, or risk to consumers.

**M. In Home Sales Pitch's Purpose Was to Sell Solar Systems and Loans in One Sitting**

108. Lead generation advertising, call center pitches, and written communications funneled consumers to the sales pitch for solar system and loans.

109. From 2021 through 2022, sales pitches were largely in person at consumers' homes.

110.   Power Home carefully scripted its sales pitch, including creating and using training videos showing salespeople the model or "perfect" pitch.

111.   Dividend had the power and authority under its agreements with Power Home to obtain sales pitch materials, including proposals, training materials, and recordings.

112.   Dividend did, in fact, obtain sales pitch materials including proposals and recorded trainings.

113.   Dividend conducted sales trainings for Power Home staff on how to sell the loans it arranged, funded, or brokered.

114.   Power Home, with Dividend's authorization and knowledge, promoted a "one sit close" or "one visit close."

115.   A "one sit close" is structured so that the consumer does not have additional time to consider a sales pitch or to compare it to other solar products or loans – the goal is to have the consumer agree to the purchase and execute contract documents that day.

**N.  Digital Proposals Helped Power Home Pitch Its Systems and Dividend's Loans Together**

116.   To achieve a "one sit close," Power Home and Dividend relied on digital sales proposals, which were used at sales visit from 2021 through 2022.

117.   The sales proposals designed a consumer's solar system, priced it, selected a specific lender, provided specific loan terms from that lender, pitched the system and the loan, incorporated Dividend's credit and loan applications, and helped transmit purchase and loan agreements.

118.    The proposals were the centerpiece of the sales presentation as shown in this screenshot from a role-played training video, with the proposal (on a tablet) in front of the consumer.



119.    In training materials, Power Home described the proposal's purpose as helping the salesperson "close your deals quickly" and to "convey the value of solar."

## O. Dividend Knew Power Home Used Sales Proposals to Sell Its Loans, Required Power Home to Provide Them, and Obtained and Reviewed Them

120.    Dividend required Power Home to provide it with each consumer's "Initial Proposals," which it described as the "preliminary proposal for financing," and as the "relevant marketing material" that preceded signing loan agreements.

121.    Dividend obtained and reviewed the digital proposals Power Home used.

122.    Dividend also obtained and reviewed training videos and manuals showing exactly how Power Home presented proposals to consumers and those proposals' contents.

123.   And Dividend integrated its lending platform into Power Home's sales proposals, to allow and help Power Home's salespeople to sell consumers Dividend loans.

## P.  Proposals Built "the Pain" from Current Utility Bills

124.   The sales proposal's overall pitch was that consumers would reallocate the money they would have spent on utility bills into a solar system and loan, reinforcing the advertising and call center message.

125.   The first step was to secure 12 months' worth of utility data from consumers to determine the consumer's energy usage and spending and to incorporate that into the sales pitch.

126.   For instance, an April 2021 sales checklist required salespeople to obtain 12 months' utility data: the checklist said, "12 Month Usage (Must Have!!)."

127.   Most consumers could and did provide utility bill data; if they didn't Power Home would create an "assumed usage" and use those numbers.

128.   Power Home then trained salespeople to scrutinize the bills, focusing on utility consumption and spending, a tactic termed "build the pain" or "feel the pain."

129.   For example, a 2018 Power Home sales training video and manual trained salespeople to ask probing questions about utility bills while standing by the utility meter to start to "build the pain of paying for power."

130.    One purpose of building the pain was to claim that solar costs would be paid from money they would otherwise spend on utility bills.

131.   Dividend knew about this tactic as it had the sales proposals and training videos used.

132.    While reviewing the pain of current utility bills, salespeople were to input utility bill data into the proposal with the consumer's participation, emphasizing how high those bills were.

133.    The proposal software then displayed and tallied the current utility costs and consumption visually, either as a bar graph, a line graph, or both.

**Q.  Misrepresenting "Savings" By Omitting Loan Costs from Key Savings Comparisons and Claims.**

134.    "Savings" claims were part of sales training materials, presentations, proposals, and brochures.

135.     The "savings" claims were deceptive because they omitted loan costs from key savings comparisons and claims.

136.    In February 2021, Power Home's Director of Sales explained this change to all sales staff in an email, writing that Power Home will be removing "cost information" and will "spend more time showing the monthly savings post solar."

137.    Removing and downplaying the "cost information" from sales proposals allowed for "savings" claims even when, in fact, costs could and generally did outweigh savings.

138.    This was a purposeful deception. It was implemented because other deceptions were failing or could no longer be used.

139.    The revised proposals used from February 2021 through Power Home's bankruptcy in October 2022 relied on two main deceptive "savings" comparisons.

140.    First, salespeople unveiled short- and long-term "savings" from energy efficiency products (as shown in the screenshot below from a model training video) without telling consumers that these "savings" did not factor in loan costs.



141.    This graphic claimed savings or reductions from energy efficiency products (described further below in section IV.X.)   Those savings were $37.54 initially (shown in large green font in the text on the left) and then increased over 25 years using the utility rate escalator (shown in the gray area on the line graph).

142.    The video instructed salespeople to tout the "savings" shown in this proposal by saying, "Now, what that's going to do is take your $171 [electric bill] all the way down to $133, saving you $37 a month. OK, so that right there alone is going to be huge for you."

143.    Salespeople were also trained to drag their cursor along the graph showing these savings increasing over time.

144. Later in the presentation, salespeople were to show consumers further "savings" under headings like "Electricity Cost Reduction," "Electricity Bill Cost," "Utility Bill Cost," or "Electric Bill Comparison."

145. The model training video screenshots below illustrates how this "Electricity Bill Cost" and "With Solar" presentation and proposal appeared:





146.　　In this video, while the screenshot above was shown, the following dialogue trained salespeople to emphasize the solar purchase's savings:

> <u>Salesperson</u>: So when we talk about your electric bill costs, uh, you currently, have a lower average [monthly electric bill of] $171. With solar that's going to drop OVER a HUNDRED dollars….
>
> <u>Customer</u>: Wow!
>
> <u>Salesperson</u>: So that is going to be beneficial for you financially, ok?

147.　　But, in fact, in the example above – the very example presented in the training video – the consumer is not going to save money because loan costs exceeded these "savings."

148.　　Had loan costs been factored into the comparisons shown, this consumer would be losing $96.73 a month on average in Year 1. But he is not told this.

149.　　Nor is the consumer told he would lose money every month on average for all 300 months of the loan term.

150. Instead, salespeople were trained to tell consumers that their bills will "drop," that the loan-backed purchase "is going to be beneficial for you financially," and that the loan-backed purchase will "be huge for you."

151. Salespeople could even click on "Preview Bills" which brought up graphs showing yearly savings starting in Year 1 and increasing each year through Year 25 as shown in the screenshots below. These bill previews deliberately omitted the loan bills to produce these savings.



152. These before-and-after solar comparisons and bill previews touting illusory "savings" proved to be an effective technique and was used in real life proposals and sales presentations throughout Virginia.

153.    For example, the "Electric Bill Comparison" page from a May 3, 2022 proposal presented to a Salem, Virginia household shows the household's "average monthly payment" decreasing from $195.42 "Pre-Solar" to $65.31 "Post-solar," a $130.19 reduction.



154.    Had this comparison included loan costs, the Salem, Virginia household could have been informed they would see no bill decrease.  The proposal could, but did not, show them they faced an estimated bill of $371.31, not $65.31, a $175.89 INCREASE from their current bill.

155.    By omitting loan costs, these proposal iterations showed consumers a misleading "reduction," "comparison," or "savings" in their "bill", "cost", or "payment."

156.     Put simply: Power Home trained salespeople and designed sales proposals to pass off money-losing products and loans as beneficial.

157.    Conversely, these proposals, these sales trainings, and the thousands of actual sales meetings using this content could have – but did not – informed consumers that they would lose money by comparing current bills with the new loan bills and utility bills the consumers would face.

158.    The omission of loan costs from these comparisons was intentional.

29

159.    In March 2022, June 2022, and July 2022, Power Home's digital proposal software provider, Aurora Solar, Inc., repeatedly met with and emailed Power Home's sales managers asking it to change its "Savings Narrative" to "include all costs," including loan and energy costs, on these "Bill Overview" pages specifically, and generally when discussing savings, costs, or bills.

160.    Aurora showed how there was a toggle—a simple mouse click—that would display the "finance payment" (the loan payment) when comparing pre- and post-solar costs.  The toggle appeared as following on Power Home's dashboard for its digital proposals.  The toggle was switched "off" for Power Home.



**Finance Payment on Post-Solar Card**

Toggle to control the visibility of the monthly payment for the selected financing option. This setting does not impact the pricing & financing page.

161.    Had Power Home switched this toggle "on," then consumers would have been shown their loan costs ("the monthly payment for the selected financing option") along with their utility "savings."  But it refused to do so.

162.    Aurora also offered to incorporate loan costs into calculations for "Lifetime Savings" and "Levelized Cost of Energy."  It explained these calculations could "take into account all the financial costs and benefits of going solar," and could display that cost/benefit data in proposals to inform consumers about actual costs and savings from solar purchases with loans.

163.    Power Home rejected this too.

164.    In June 2022, another lender made the same points to Power Home, telling it that its digital proposals were misleading customers about the value proposition and misrepresenting the performance "the performance, savings, or value provided by the products installed."

165. Power Home did not markedly change its practices or its sales proposals after these criticisms.

166. Dividend had similar information about the proposals used to sell its loans and knew or should have known that the sales proposals and sales presentation were misleading to consumers.

167. Dividend also expressed concerns about these proposals. For example, in a May 2021 email, it asked Power Home how they would, "deal with a consumer who complains that their electricity bill wasn't reduced by the amount in the sales proposal and claims they paying [*sic.*] more than expected on a monthly basis between utility bill & solar loan?"

## R.  Deceptive Energy Efficiency Product "Savings" Claims

168. Beyond omitting loan costs, the "savings" claims shown above relied upon reductions in energy use or "savings" from energy efficiency products.

169. Power Home sold energy efficiency products from 2017 until its October 2022 bankruptcy.

170. The energy efficiency products changed slightly over the years, but one purpose remained the same: offset high prices by claiming these products would "reduce" or "save" up to 25 or 30% of a consumer's current energy consumption.

171. These energy efficiency "savings" were material to the sales pitch for products and loans.

172. From 2021 through 2022, sales proposals consistently claimed energy efficiency products would significantly increase "savings" to reduce the purchases' and loans' apparent cost.

173. From 2021 through 2022, proposals and sales presentations claimed that energy efficiency products would lead to a 25% savings or reduction in utility bills.

31

174.    In turn, these 25% savings or reduction claims were baked into all estimates of monthly, yearly, and lifetime savings shown in these proposals.

175.    Power Home trained salespeople to tell consumers its energy efficiency products savings claims were "conservative," "very conservative," or a "very, very conservative" estimate.

176.    It also trained salespeople to tell consumers that even if they did not use these products well, there would still be substantial savings or an energy reduction or offset.

177.    It also trained salespeople to tell consumers specific "savings" that individual energy efficiency items were "going to have."

178.    For example, in the 2021 Official Presentation, sales people were trained to say, "So at the top we've got blown in insulation, we're going to come in and do R-49, Pink Panther R-49 blown in insulation that's going to have a 9% impact." [Underlining added.]

179.    Another claim was that "air sealant tape" would reduce consumption by 2% because installers would find and seal all leaks in a consumer's HVAC ducts and system.

180.    These energy efficiency claims were deceptive for three main reasons.

181.    The first deception was to provide specific and precise energy efficiency reduction figures, when, in fact, Power Home and Dividend knew or should have known that energy efficiency reductions vary widely depending on the home's specifics – different homes have different responses to energy efficiency measures depending on their airtightness and other factors.

182.    In the real world, a pre-install audit and testing is used to accurately determine the impact of energy efficiency measures – like adding insulation – on a specific home.

183.    Without such an audit, estimates like the ones made in the sales proposals were speculative, inaccurate, and could not be home-specific.

184.   The second deception was to claim energy efficiency reductions for products consumers already had, or for products consumers could not use, or both.

185.   For example, one claimed reduction was that delivering consumers a box of LED light bulbs would reduce their whole home's electricity consumption by 4% for 25 years.

186.   Proposals and sales presentations relied on this 4% reduction claim even when it could not apply to a given home, including homes already using LED lights, whose fixtures did not match the bulbs provided or wattage provided, or homes of different sizes with more fixtures in their house than the bulbs provided.

187.   Likewise, Power Home claimed $10 worth of faucet aerators and showerheads would reduce an entire home's electricity consumption by 5% for 25 years.  Proposals and sales presentations relied on this 5% reduction claim even when it could not apply to a given home, including homes with such aerators or showerheads already or with more faucets or showerheads than what was provided.

188.   Power Home also claimed attic insulation would reduce electricity consumption by 9% for 25 years. But it delivered the same amount of insulation regardless of the home's size and attic, which would not yield 9% savings over 25 years for homes that did not have attics, had attics only over a small portion of the home, which already had sufficient attic insulation, or for which the amount of insulation Power Home provided was insufficient.

189.   The third deception was to assume energy efficiency items would always be properly installed, when, in fact, installation teams struggled.

190.   For instance, attic installation was also often subpar: sometimes installers just dropped insulation off and did not install it, or they rushed through the work.  This was never

accounted for in the estimated 9% savings from attic insulation, which assumed that in all cases, products would be properly installed.

**S.  Dividend Knew Energy Efficiency Savings Claims Were Material to the Sales Pitch for Its Loans and Knew Purchasers Were Not Receiving the Claimed Energy Savings**

191.    Dividend knew Power Home used energy efficiency claims to claim savings on purchases and loans and to offset high prices.

192.    In May 2021, Dividend suggested that Power Home's energy efficiency claims were a reason to permit prices that it thought were "incredibly high."

193.    Dividend was on notice from complaints that consumers were not receiving the energy savings that the proposals told them they would.

194.    In investigating these complaints, Dividend checked the energy production from solar panels but did not check to see if consumers actually received savings or reductions from energy efficiency items.

**T.  The Solar Production Savings and the Faulty Assumptions Underlying It**

195.    Besides energy efficiency products, the other component of the "savings" that Power Home calculated was the solar panels' energy production.

196.    Sales proposals estimated this energy production as a percentage and in kilowatts.

197.    For instance, on or around July 28, 2020, a consumer in Virginia Beach was shown a digital proposal with a pie chart and text showing that "Post-Install," solar production would reduce their current bill by 48%, as follows:



198.    In the proposal shown above, the pie chart shows "Solar Production 48%," and a corresponding 48% for "Estimated Solar Offset of Current Consumption," under the heading "Est. Post-Install Energy Breakdown."

199.    From 2017 through Power Home's October 2022 bankruptcy, all proposals and sales presentations used and relied upon similar estimates of and assumptions about "Solar Production," although the graphics and accompanying text varied.

200.    There were several faulty assumptions behind these production calculations.

201.    First, they assumed that all consumers' solar panels would be properly installed and functioning after the purchase.

35

202.    In reality, Power Home was systematically behind on installations, because it was selling systems faster than it could install them.

203.    And, in reality, Power Home's installations could be deficient, damaging structures, yards, trees or plants, pipes, plumbing or electrical systems, and misinstalling solar panels, electrical boxes, or batteries, so they failed to work properly (or at all).

204.    So, in reality, not every purchaser received a system that reached its estimated production after or "post-" installation.

205.    Dividend knew that not every consumer would reach its estimated production or estimated solar offset at the time of installation.

206.    Every week, Dividend sent Power Home a list of the customer backlogs for operational systems.  This list lengthened steadily from 2021 to 2022.

207.    So Dividend systematically tracked Power Home's installation delays and problems.

208.    But the sales proposals did not consider or factor in the possibility of installation delays, problems, or risks into their estimated production calculations, which made these estimates inaccurate at the time they were made and afterwards.

209.    Moreover, Power Home's energy production and solar offset calculations assumed that the solar panels, once installed, would continuously function during their lifetime.

210.    In reality, Power Home's systems sometimes stopped working, for a variety of reasons, including installation errors and malfunctioning components.

211.    But sales proposals did not consider or factor the risks that systems would stop working into its estimated production calculations, which made these estimates even more inaccurate at the time they were made and afterwards.

36

**U. Delay, Downplay, and Mislead Consumers About Prices and Loan Costs: "Our average person pays this off between six to eight years."**

212.     Only after consumers had been repeatedly told and shown their so-called "savings," did Power Home's salespeople discuss the loans.

213.     Power Home trained salespeople to present cost and loan specifics at the "last stage" as they called it.

214.     Conversely, it trained salespeople not to give consumers price specifics early in the pitch, even training them to falsely tell consumers at the beginning of the sales pitch that it would only take 10 minutes to get the price, when, in fact, it would take more than an hour.

215.     The sales proposals generally had a single page describing loans or financing.

216.     The financing and loan page and sales discussion deliberately came after comparisons showing the consumer's "savings," including the comparisons described above to convince consumers that they would be saving money.

217.     A model sales training rushed the consumer through the "Financing" page, telling salespeople to say, "So what we have to do now is to go through the rest of this really quick."

218.     When describing the financing or loan, Power Home also trained salespeople to tell consumers that despite 25-year loan terms, "our average person pays this off between 6 to 8 years."

219.     Power Home's "Official Presentation" in 2021 included this 6- to 8-year pay-off claim, training salespeople to say, "The length of the loan is 25 years. It's structured that way because we want to make solar affordable for everyone. We want everybody to have the ability to own their own power. And so if you extend it out that long and it makes it affordable for everyone, but our average person pays this off between six to eight years."

220.    The claim that the average Power Home consumer paid off their 20 to 25-year loans in 6- to 8-years was false as was the claim the loan was "affordable for everyone."

221.    In reality, when this claim was made – from at least 2021 through 2022 – Power Home did not even have consumers who had had Dividend 25-year loans for 6 to 8 years.

222.    Furthermore, the loan data that did exist showed that the average consumer was not paying off loans early (unless they sold their house and were forced to pay off their loan).

223.    One purpose of the false 6- to 8-year pay-off claim was to mislead the consumer about the length and risk of the loan.

224.    Another purpose of the false 6- to 8-year pay-off was to convince the consumer that savings from the solar purchase would quickly and considerably exceed costs, allowing for an early loan payoff.

225.    But, in reality, the opposite was happening: consumers' loan costs exceeded their savings, and they generally were not able to pay off loans quickly.

226.    And Power Home and the Dividend knew that from their proposal data, loan data, and from consumer complaints.

## V.  Deceptively Reduce the Loan Amount by the Tax Credit

227.    When finally providing consumers with the loan amount, Power Home trained salespeople to immediately subtract a 26% or 30% federal tax credit from that loan amount.

228.    For example, Power Home's "Official Presentation" taught salespeople to provide the federal tax credit calculation and the loan amount at the same time, as follows: "So, the total system cost is that $70,654, BUT just like I was talking to you earlier about the federal tax credit – this is the dollar for dollar tax credit, not refund, that you could be eligible to get depending on how much you paid in in federal taxes. So you're eligible to get $18,370 back, which is 26% of

that system cost. And we do the math: it's just– you take the $70,654 and minus that $18,370 from it, which means Uncle Sam's going to reduce that payment down for you to $52,284."

229.    Likewise, in Power Home's role-played training, the salespeople provided the federal tax credit calculation immediately before and after revealing the loan price, stating, "your tax credit for this system is going to be $14,512, okay? So a BIG chunk of the system right now is getting paid. And that's important because that is subject to change. So by you making the decision to go solar today, we are going to be able to offer this tax credit to you. Okay?"

230.    Then after the price is revealed, he again immediately discusses the tax credit: "So the total in entirety is $55,816. Okay. Now, that's that before the tax credit, right? And so you take tax credit out of that and that's how that works."

231.    Phrases like – "we do the math," "Uncle Sam's going to reduce," "a BIG chunk of the system right now is getting paid," and "you take the tax credit out of that and that's how that works" – all tell, suggest, or imply that the consumer will or is likely to receive the tax credit.

232.    By default, sales proposals included and deducted the full federal tax credit when displaying the total or monthly solar loan price.

233.    Proposals used from 2021 to 2022 assumed consumers would receive the full federal tax credit.  For example, as shown below, a June 2022 proposal's financing page showed a "Net Cost" and a "Monthly Loan Payment" assuming the consumer receive the tax credit  as shown by the checked "ITC Pay Down Applied."



234.    Proposals like the one shown above were used to sell Dividend's loans in Virginia.

235.    In reality, many consumers were not, in fact, receiving the tax credit or applying it to their loans and Dividend knew or should have known this.

236.    It was misleading to assume that all consumers would receive the full federal tax credit and apply it to their loans, when, in reality, many could not do so or were not doing so.

237.    Power Home also trained salespeople to tell consumers they could spend the federal tax refund on motorcycles, debt, or vacations.

238.    For example, salespeople were trained to tell consumers that they could use the tax credit to "buy some farm equipment, to take the family on vacation, pay off a credit card? Cool,

it's your money, you can do whatever you want with it. But if you choose not to apply it to the system costs, then that $253 will go up a little bit."

239.    As shown above, the proposals reinforced this with language like "HOW WILL YOU USE YOUR INCENTIVE?"

240.    Having consumers "mentally spend" the tax credit on farm equipment, vacation, credit card debt, or college tuition, when, in fact, the prices and monthly loan payments shown to them assumed they would not spend the tax credit this way, deceived them.

**W. Salespeople Used Their Appearance of Expertise to Exaggerate Savings**

241.    Power Home trained salespeople to appear as experts.

242.    A training manual emphasized in bold, "In order to create trust they need to like you & Believe that you are an expert."

243.    A sales manual instructed salespeople to start with a "Walk Around Inspection," whose first goal is to "Establish that you are an expert." It described this step as "imperative," and "very important," and said, "Establish that you are an expert by asking pointed questions pertaining to potential problems such as shade trees, azimuth, panel locations, etc."

244.    Salespeople used their apparent expertise to exaggerate the value of the loan-backed solar purchase.

245.    Salespeople falsely told consumers the solar loan would not cost them more than their current average utility bill, even when proposals might project otherwise.

246.    Salespeople also told consumers that they would see specific or complete energy bill reductions such as "you most likely won't have a power bill," "this will put electricity back into the grid," "this will power your home 90% of the time," "solar would cover 80% of your power," or this will result in a "30% energy use reduction."

41

247.    For example, in March 2021, the Chief Sales Officer wrote to all sales managers and directors, "Hey Team. Joe is starting to get a lot of consumers coming through retentions that think they won't have a power bill once they go solar. Please make sure your team is educating the consumers properly on the remaining power bill they will have once they go solar."

248.    Salespeople also deceived consumers about the tax credit, making it seem more certain than it was or promising a check from the government, which it was not.

249.    Salespeople also told consumers they would have specific bill reductions, e.g., a "$200 decrease in your energy bill" or "this will lower your electric bill to below $50 a month" or "this will lower your bills to almost nothing (you can even make money)" or this will save you $1,700 a year.

250.    Dividend was aware of repeated consumer complaints regarding sales deception, including complaints that salespeople had claimed greater reductions in energy usage and "savings" than even the sales proposals indicated.

251.    In January 2022, Dividend placed Power Home on a "watch list," due in part to what its General Counsel called, "disproportionately high fraud and misrepresentation complaints and high overall complaint rate[.]"

252.    Four months later, Dividend forwarded Power Home fraud complaints, including an elderly Virginia consumer alleging a salesperson had promised her "no electricity bill," despite her sales proposal (which Dividend reviewed) estimating only a 37% utility bill reduction.

253.    Two month later, a Dividend manager discussed "another complaint" from Power Home that "has the same kind of thumbprint as the others we've been pushing back their way," in which the consumer reported "that they were guaranteed by their salesperson that they would not have a power bill, but in reality are saving very little on their power bill despite the system working

42

properly," which the manager attributed to "[i]mproper/misrepresented expectations set by PHS [Power Home] sales rep where they tell HO [homeowner] that power bills will disappear (in line with a lot of these PHS complaints)[.]"

254.    Then in September 2022, Dividend's General Counsel demanded Power Home repay $2,020,419 to Dividend for 27 consumers who complained of "fraud and/or misrepresentation."  He wrote in his email, "Over the course of the relationship with Pink Energy, [Power Home's new name] Dividend has received hundreds of complaints alleging, among other things, fraud, misrepresentation and/or deceptive acts or practices on the part of Pink Energy" at a greater rate than other installers.

255.    Dividend sent Power Home a spreadsheet evaluating these 27 complaints.  As shown in the excerpt below with complaints from six Virginia consumers, Dividend's spreadsheet contrasted the consumer's "Sales Proposal Offset" (e.g. 46%, 35%, 32%) to the salespeople exaggerated promises, "Promised/Expected Production" (e.g., 100%, 100%, 130%):

| Loan Amount | Sales Proposal Offset | Promised/Expected Production | Synopsis |
|---|---|---|---|
| $69,600.00 | 46% | 100% | ███ was told that his system would offset a majority of his consumption. According to the sales proposal generated in Aurora by Power Home, the system can only offset 46%. Power Home agreed to a loan modification of ($28,417) which Dividend has already provided to ███ Power Home has yet to remit payment to Dividend |
| $64,911.00 | 35% | 100% | ███ was told by his sales representative that the system would offset a majority of his consumption. According to the sales proposal generated in Aurora by Power Home, the system will only be able to offset 35%. ███ also states that a technician came out to fix the system and he would subsequently see a reduction in his Utility Bill. He has not seen any reduction. ███ also states that Power Home promised to reimburse him for his utility bill for a full year, but then declined to do so. |
| $64,911.00 | 32% | 2500 kWhs/month / 130% | ███ was told by his sales representative that his system would offset 130% of his consumption. According to the sales proposal generated in Aurora by Power Home, the system will only be able to offset 32%. ███ has retained an attorney and they had issued Dividend a Cease & Desist order. |
| $71,575.00 | 56% | 100% | ███ informed Dividend that his utility bills were still very high after panels were installed. The sales proposal generated in Aurora by Power Home shows a 56% offset of consumption. |
| $58,240.00 | 53% | 100% | ███ states that his system is not producing what his sales representative promised it would. According to the sales proposal generated in Aurora by Power Home, ███'s system can only offset 53% of his consumption. |
| $71,575.00 | 50% | 100% | ███ was guaranteed by her Power Home sales representative that she would receive a $14,000 ITC. |

256.    And Dividend provided synopses, including this Virginia complaint: "[Consumer] states that his system is not producing what his sales representative promised it would.  According to the sales proposal generated in Aurora by Power Home, [Consumer]'s system can only offset 53% of his consumption."

257.    This spreadsheet showed Dividend knew consumers reported salespeople claiming greater savings and system performance than those "generated" by Aurora sales proposals.

258.    It also showed Dividend knew the Aurora sales proposals were providing and showing customers estimated solar and energy efficiency savings or "offsets"; Dividend had access to the Aurora proposal data and could compare it to what customers actually received; and Dividend knew this data was important to and material to the sale of systems and loans.

259.    In that September 2022 email, Dividend's counsel also sent Power Home nine affidavits from consumers on forms it drafted.  The forms had check boxes to "describe[] the fraudulent or deceptive activity": including boxes for "I was promised savings (e.g. little to no utility costs) if I purchased a solar system" and "I was told that my solar equipment would produce significantly more energy than it is actually producing" as shown in the following screenshot:

Please check the appropriate box or boxes below that describes the fraudulent or deceptive activity:

☒ I was promised savings (e.g., little to no utility costs) if I purchased a solar system
☒ I was told that my solar equipment would produce significantly more energy than it is actually produ
☐ I did not authorize a credit review
☐ I did not sign or authorize the execution of the Solar Loan Agreement
☒ Other (specify): _that I would get a tax refund of 14,767 to apply to the loan_

260.    Dividend's "fraudulent or deceptive activity" check boxes showed it was on notice of and regularly received complaints like: "I was promised savings" or "I was told that my solar equipment would produce significantly more energy than it actually produced."

261. Dividend had no practice of systematically providing loan relief to the hundreds of consumers complaining of fraud, misrepresentation, unfair, or deceptive practices.

262. Even after January 2022, when Dividend began interventions to address widespread consumer deception complaints, Dividend continued issuing loans to Power Home consumers in Virginia from February to July 2022.

263. In sum, Dividend was on notice that Power Home's salespeople were engaging in misrepresentations and fraud about the energy production, value, and savings consumers could expect from Power Home's products and Dividend's solar loans.

## X. Sub-Conclusion: Thousands of Virginians Were Systematically Deceived about the Value of Solar Purchases and Loans

264. Ultimately, Power Home's and Dividend's advertising, marketing, and sales presentations deceived consumers about the value of their solar purchase and loan.

265. Thousands of consumers bought systems that they thought would save them money, but, in reality, cost them more than they were paying before solar, and, currently, years after their purchase, continue to do so.

## V. FACTS PART II OF II: DIVIDEND'S HIDDEN LOAN FEES DECEIVED CONSUMERS AND INCREASED PRICES

266. Dividend charged hidden loan fees on every consumer loan.

267. Dividend called its fee a "Platform Fee," a "Management Fee," or a "Dealer Fee."

268. Its "Platform Fee" on Power Home loans was 15.5% or 16%.

269. These fees increased loan prices above the cash price in two main ways.

270. First, fees increased the cash price of solar purchases: Power Home charged consumers who paid cash a lower price than it charged to the Dividend's loan consumers.

271.    Second, consumers – not Power Home – paid the Platform Fee and additional interest from those fees.

272.    As illustrated below, Dividend made consumers responsible for paying these fees: it included the fee in the loan principal, it deducting or retained the fee from what it paid, funded, or disbursed to Power Home, and it made consumers responsible for paying the fee it deducted or retained.

273.    Dividend hid and omitted its Platform Fee from consumers in multiple ways.

274.    First, it hid and omitted the Platform Fee in consumers' sales proposals by folding the Fee into the "System Cost."

275.    Second, it hid and omitted the Platform Fee in its Truth in Lending Act Disclosures.

276.    For example, on or around April 6, 2022, a Cape Charles, Virginia consumer took out a 25-year Dividend loan for $59,740 that included a $9,259.70 (15.5%) Platform Fee.

277.    The Cape Charles consumer, as did all consumers, received Truth in Lending Act Disclosures from Dividend.

278.    The example below shows two portions of Dividend's Truth in Lending Act Disclosures to this consumer.  In red is how it should have disclosed its Platform Fee, contrasted with its actual disclosures:



279.    To hide its Platform Fee, Dividend misrepresented the "Amount Paid to Others on Your Behalf," claiming to send $59,499 to Power Home "for Collateral and Installation," when, in fact, Dividend would send $9,259.70 (15.5%) less.

280.    Likewise, Dividend misrepresented the "Principal Amount of Loan" as the "sum of all payments" made to Power Home on the Borrower's behalf, when, in fact, it was not paying Power Home that amount.

281.    As illustrated, hiding the $9,259.70 (15.5%) Platform Fee understated the Finance Charge and Annual Percentage Rate, overstated the Amount Financed, and overstated the "Principal Amount of the Loan" and the "Amount Paid to Others on Your Behalf" in the Itemization of Amount Financed.

282.    In reality, both Power Home's and Dividend's records show that Dividend deducted or withheld its $9,259.70 (15.5%) Platform Fee from what it sent Power Home for the solar system equipment and installation.

283.    Power Home's records show two disbursements from Dividend to Power Home, both of which withheld the Platform fee, as shown below:

| Disbursement Type | Release Date | M1 | M2 | Loan Amount | Milestone Amount (pre-fee) | Platform Fee% | Platform Fee($) | Disbursement Amount |
|---|---|---|---|---|---|---|---|---|
| Substantial Completion | 3/9/2022 | 35 | 65 | 59740 | 38831 | 15.5 | 6018.81 | 32812.19 |
| Work Order | 1/19/2022 | 35 | 65 | 59740 | 20909 | 15.5 | 3240.9 | 17668.1 |

284.    Together these two disbursements withheld $9,259.70 ($6,018.81 + $3,240.90) in Platform Fees, disbursed $50,480.30 ($32,812.19 + $17,668.10) to Power Home, and made the consumer responsible for the loan amount of $59,740, including the fee.

285.    Dividend's records show the same two disbursements from Dividend to Power Home, both of which withheld the Platform Fee, as these excerpts show:

| Disbursement Type | Milestone Amount pre-fee | Disbursement Amount | DS Project: Loan ID: Lo | Total Fee | Created Date |
|---|---|---|---|---|---|
| Substantial Completion | $    38,831.00 | $    32,812.19 | DivLev25 | $    6,018.81 | 3/9/2022 |

| Disbursement Type | Platform Fee Rate (%) (Loan) | Milestone Amount pre-fee | Disbursement Amount | Release Date |
|---|---|---|---|---|
| Work Order | 15.5 | 20909 | 17668.1 | 1/19/2022 |

286.    Together these two disbursements withheld $9,259.70 ($6,018.81 + $3,240.90) in Platform Fees and disbursed $50,480.30 ($32,812.19 + $17,668.10) to Power Home.

287.    Ultimately, this consumer must pay the full "Loan Amount" of $59,740, including the "Total Fee" of $9,259.70.

288.    These misrepresentations of the "Finance Charge," "Amount Financed," "Itemization of the Amount Financed," "Amount paid to others on your behalf," and the "Annual Percentage Rate," recurred in all Truth in Lending Disclosure Statements and loan agreements used by Dividend for Power Home loans.

289.    Third, Dividend and Power Home agreed to hide and omit the Platform Fees in Power Home's purchase agreements.

290.    For example, the following purchase agreement for the Cape Charles consumer discussed above falsely claimed $59,740 as the cost of the "Product(s)/Services" and as the "Total Contract Price," when, in fact, the cost of these products and services was only $50,480.30.

| Qty | Product(s)/Service(s) |
|---|---|
| *Solar Energy System* | |
| 14 | 400w - HANWHA Q CELLS |
| | |
| *Battery Backup (only complete if applicable & Back-Up Battery Addendum **Must** be Attached)* | |
| 1 - $21,500 | Generac battery cabinet (contains three (3) 3.0 kWh modules) |
| 0 | Generac (3.0 kWh) (*each* additional module) |
| | |
| *Other* | |
| | |
| | |

| | | | |
|---|---|---|---|
| | | **Subtotal** | $ 59740 |
| | | **Taxes** | $ |
| | | **Total Contract Price*** | $ 59740 |

\* This amount does *not* include Federal, state, local, utility or third-party tax credits, incentives or rebates (if any) or Company rebates (if any). Customer should consult its own independent tax or financial advisor regarding the foregoing.

291.    Finally, Dividend's Loan and Security Agreements misrepresented that "proceeds from the Loan will solely be used to pay for the design and installation of solar photovoltaic (PV) electricity generation, energy storage, and/or related equipment or improvements (the 'Collateral') at the Home," when, in fact, loan proceeds were also used to pay the Platform Fee.

49

292.    Put simply, the consumer paid the "loan fee," or "dealer fee", not Power Home; it was passed along to the homeowner or, in Power Home's words "rolled" into the purchase price and loan amount.

## Y. Each Loan Agreement Subjects Loan Holders to Any Claims or Defenses Consumers Had Against Power Home

293.    Each consumer loan agreement entered into by Dividend contained legally required language making loan holders subject to any claims and defenses consumers had against Power Home.

294.    Also known as the "Holder Rule," this language provides:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

## VI. COUNTS

### Count I: Deception about Value, Savings, Costs, and Risk in Violation of the federal Consumer Financial Protection Act, 12 U.S.C. § 5531(a)

295.    Plaintiff realleges paragraphs 1-294.

## A. Relevant Law

296.    The Attorney General of any state has authority to enforce the federal Consumer Financial Protection Act. 12 U.S.C. § 5552(a)-(b).

297.    That Act provides in part: "It shall be unlawful for – (1) any covered person or service provider . . . (B) to engage in any unfair, deceptive, or abusive act or practice[.]" 12 U.S.C. § 5536(a)(1)(B).

298.    A "covered person" is "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6).

299.   A "covered person" may include sellers of "nonfinancial goods or services," ("merchants") when "such person is engaged in offering or providing any consumer financial product or service."  12 U.S.C. § 5517(a)(1).

300.   A "covered person" includes "related persons," meaning "(i) any director, officer, or employee charged with managerial responsibility for" a "covered person" or (ii) "any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person."  12 U.S.C. § 5481(25)(B), (C)(i)-(ii).

301.   A "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service," with exceptions for data processors, ministerial support services, and media providing advertising time or space.  12 U.S.C. § 5481(26).

302.   A "consumer financial product or service" means "any financial product or service described in [12 U.S.C. § 5481] paragraph 15 and is offered or provided for use by consumers primarily for personal, family, or household purposes . . . ."  Paragraph 15 of the statute includes subdivision (i) ("extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit,") and subdivision (x) ("collecting debt related to any consumer financial product or service").  12 U.S.C. § 5481(5).

**B. Dividend is Subject to the Act as a Covered Person or Service Provider Engaged in Offering a Consumer Financial Product**

303.   Solar loans are a consumer financial product or service because they are offered to and provided to consumers to purchase residential solar products (panels, inverters, batteries) and services (installation and repair) primarily for consumers' personal, family, or household purposes, as alleged in section IV.A.

304.   Dividend is a "covered person" under 12 U.S.C. §§ 5481(6) and 5536(a)(1)(B) because it extended consumer credit, serviced consumer loans, sold consumer loans, and collected consumer loan debt.  It extended credit from approximately May 2021 to July 2022, entering into over 500 loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems and by selling many of those loans to third party investors.  It also serviced and collected debt for those loans.

**C. Advertising, Marketing, and Sales Practices Deceived Consumers about the Value, Savings, Costs, and Risks of Solar Purchases and Solar Loans.**

305.   From 2021 until Power Home's October 1, 2022 bankruptcy, Dividend engaged in deceptive acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B) to sell its loans as detailed in the Facts sections and summarized here.

306.   Dividend knew the loan-backed solar systems sold here were risky purchases: with higher-than-average prices, fees, battery sales rates, and loan amounts, many consumers would lose money initially, for years to come, or for the entire loan term, as described in sections IV.A, D-F and Q-V.

307.   Deception began with advertising, which, from 2021 to October 2022 generated thousands of consumer responses by claiming consumers could pay nothing out of pocket or no money down, could save thousands of dollars, could reduce their bills, or could qualify for tax

credits, while omitting or obscuring that consumers would take on loans, debt, or risk, as described in section IV.G and I.

308.   Next a website and landing pages, which, from 2021 to October 2022, emphasized savings and lack of costs without disclosing actual costs or that consumers would be taking on loans, debt, or risks, as described in section IV.H.

309.   Then, from 2017 to October 2022, a call center told consumers that solar would cost them nothing out of pocket or nothing more than their current utility bill, touted savings from solar purchases, and implied consumers would receive the federal tax credit based on their income, all while avoiding disclosing the "numbers, specifics, or details," of loans, debt, or risks as described in section IV.K.

310.   After calls, scheduling texts reiterated that consumers would "save thousands," and "save on their electric bill," as described in section IV.L.

311.   From February 2021 to October 2022, the sales pitch focused on misrepresenting the consumers' "savings" on utility bills without properly accounting for post-solar loan bills leading to a misrepresentation of the actual savings, costs, or value of the systems and loans – as described in section IV.Q.

312.   From 2021 to October 2022, the sales pitch also claimed energy efficiency products would reduce consumption by up to 25-30% even though products often were not needed, installed, or properly installed; products' efficacy varied between homes; and products were not shown, in fact, to be achieving these savings for consumers, as described in section IV.R-S.

313.   From 2021 to October 2022, the sales pitch also claimed or assumed that the solar systems purchased would start working immediately and continuously function for 25 to 30 years, when, in fact, installations were behind schedule, payments started before systems were connected,

and systems had problems initially and periodically, making these energy production estimates inaccurate as described in section IV.T.

314.    From 2021 to October 2022, salespeople delayed revealing loan prices until the end of the hours-long sales pitch, rushed consumers through price and financing information, and falsely claimed "our average person pays this [25-year loan] off between 6 to 8 years" as described in section IV.U.

315.    From 2021 to October 2022, when displaying and discussing loan costs, salespeople and sales proposals deducted the federal tax credit to assume and imply to consumers they would receive the credit and to downplay the loan amount, when, in fact, as Defendant knew or should have known, few consumers were receiving and applying the tax credit to their loans, as described in section IV.CC.

316.    From 2017 to October 2022, Power Home's salespeople used their appearance of expertise to reinforce and, in some cases, go beyond, the standard sales message by telling consumers exaggerated savings claims, as described in section IV.W.

317.    Ultimately, the advertising, marketing, and sales messages used to sell solar systems and solar loans deceived thousands of Virginians about material facts: the value, savings, and costs of, and risks of loss from, those purchases and loans.  These deceptions affected and harmed consumers, obscuring what all the Defendant knew well: consumers faced initial, yearly, and often long-term losses from loan-backed solar purchases.

318.    Dividend engaged in these deceptive practices and is liable.

### D. Dividend's Liability

319.    Dividend engaged in deception in violation of 12 U.S.C. § 5536(a)(1)(B) by authorizing, adopting, and ratifying the deceptive marketing, promotion, advertising, and sale of its loans.

320.    Dividend delegated to Power Home the advertising, marketing, promotion, and sale of its loans, subject to its control, as alleged in sections IV.B, J, M, O, Q and S.  This included delegating responsibility for credit applications, loan applications, discussion (if any) of loan terms and loan disclosures, and loan agreement execution as described in sections IV.B and Q.

321.    Dividend generally avoided directly communicating with consumers until after they signed their loan agreements.  In the few cases when it conducted "Welcome Calls" – less than "2% of all deals" in its words – it did so with Power Home's salespeople in the room as described in section IV.B.

322.    Dividend knew the advertising, marketing, and sales pitch used to sell its loans; repeatedly and regularly met with Power Home's sales managers, sales trainers, and sales staff; and reviewed both Power Home's sales pitch and its process for conducting Dividend's credit application, loan application, and loan execution as described in sections IV.B, M, O, Q, and S-T.

323.    In 2021 it also obtained and reviewed Power Home's sales proposals and written and video recorded sales training materials for those proposals then worked with Power Home and sales proposal companies to integrate Dividend's credit application, loan application, and loan documents into the sales proposal as described in section IV.O.

324.    Dividend knew the advertising, marketing, and sales pitch had to sell what it called "incredibly high" priced systems and loans (at prices that exceeded Dividend's "standard rail guards") to value-focused consumers, as described in sections IV.D-F.

325.    The sales proposals and training videos Dividend obtained in 2021 showed how Power Home was deceptively selling money-losing systems and loans to consumers including the deceptive comparisons described in section IV.O, the energy efficiency product savings claims described in section IV.R-S, the solar production savings claims described in section IV.T, and the loan cost and tax credit claims described in sections IV.U-V.

326.    Dividend also knew by at least January 2022 that salespeople misrepresented the performance of and savings from loan-backed solar purchases as described in section IV.W.

327.    As a result, Dividend's delegation encompassed the deceptive advertising, marketing, and sales practices that occurred during the May 2021 to October 2022 period it made loans to Virginians to purchase Power Home's systems.

328.    Dividend was on notice from consumer complaints and its own evaluation of consumer complaints that consumers were not receiving the value, savings, offset, energy efficiency savings, or energy production estimated from their sales proposals or that the salespeople claimed as described in sections IV.T and W.

329.    Dividend accepted over 500 loan agreements and promissory notes with Virginians for purchases of Power Home's solar systems from May 2021 through July 2022 obtained through these deceptive acts and practices.

330.    Dividend did not reject loan agreements with consumers despite its awareness of the deceptive practices underlying the agreements as alleged in section IV.W.

331.    Dividend is liable for these deceptive acts or practices because it engaged in them.

332.    Dividend is also liable under agency law for any deceptive acts or practices conducted by Power Home with respect to Dividend loans because it granted actual agency to Power Home to engage in those acts or practices.

333. An actual agency relationship is one wherein the principal authorizes the agent to act for the principal's benefit but, at the same time, retains the right to control the agent's conduct. When determining whether an actual agency relationship exists, courts should examine the conduct of, and relationship between, the parties involved. *See, e.g., Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659-60 (4th Cir. 2019).

334. Dividend authorized Power Home to engage in advertising, marketing, and sales, subject to its control; it trained salespeople; it obtained and reviewed sales training materials and proposals; it integrated its loan platform into sales proposals; and it controlled pricing, including permitting and encouraging Power Home to exceed its usual price limits, all of which led to the consumer deception and harm alleged here.

335. Dividend is also liable under agency law because it ratified Power Home's deceptive advertising, marketing, and sales practices.

336. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Hodgin v. UTC Fire*, 885 F.3d 243, 252 (4th Cir. 2018) (*citing* Restatement (Third) of Agency § 4.01(1) (2006)). A party "may ratify an act by failing to object to it or to repudiate it," or by "receiving or retaining [the] benefits it generates." Restatement (Third) of Agency § 4.01 cmts. f-g (2006).

337. Dividend ratified Power Home's advertising, marketing, and sales practices because it received, retained, and did not repudiate the benefits of those practices when it accepted and enforced its Virginia loan agreements. It knew the material facts of how those agreements were advertised, marketed, and sold from the sales presentations and proposals it reviewed and from – by its own General Counsel's admission – "hundreds of complaints, alleging, among other things, fraud, misrepresentation and/or deceptive acts or practices on the part of Pink Energy

[Power Home]." It even compiled affidavits from consumers who were "promised savings (e.g. little to no utility costs)" and were "told my solar equipment would produce significantly more energy than it is actually producing."

338.    As described in section V.F, the Holder Rule also makes Dividend liable to consumers for the seller's deceptive practice for loans it holds.

### Count II: Hidden Loan Fees in Violation of the Federal Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), Truth in Lending Act and Regulation Z

339.    Plaintiff realleges paragraphs 1-338.

### A. Relevant Law

340.    The federal Consumer Financial Protection Act provides in part: "It shall be unlawful for (1) any covered person or service provider – (A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law[.]" 12 U.S.C. § 5536(a)(1)(A).

341.    "Federal consumer financial laws" means certain "enumerated consumer laws" including the Truth in Lending Act as well as "any rule or order prescribed by the [Consumer Financial Protection] Bureau under this title, an enumerated consumer law, or pursuant to authorities transferred to" the Bureau.  12 U.S.C. § 5481(12, 14).

342.    Regulation Z, 12 C.F.R. § 1026.1 *et seq.*, is the Truth in Lending Act's implementing regulation and is a rule or order prescribed by the Bureau, by an enumerated consumer law, and by an authority transferred to the Bureau under 12 U.S.C. § 5581.

343.    The Truth in Lending Act's declared purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms

available to him and avoid the uninformed use of credit . . . ." 15 U.S.C. § 1601(a*); see also Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 326 (6th Cir. 2001) ("TILA endeavors to enable consumers to evaluate credit offers separately from the purchase of merchandise, and thereby to create an active market providing more efficient credit prices.").

344.    The Truth in Lending Act in relevant part defines "creditor" as

only . . . a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.  15 U.S.C. § 1602(g).  *See also* 12 C.F.R § 1026.2(a)(17) (Regulation Z definition).

345.    Both the Truth in Lending Act and Regulation Z require creditors to disclose the amount financed, finance charge, annual percentage rate, loan term, payment schedule, and total amount of payments. 15 U.S.C. § 1638(a)(2-6); 12 C.F.R. § 1026.18(b-h).

346.    Disclosures must be accurate.  *See* 15 U.S.C. § 1631(c-d); 12 C.F.R. § 1026.17(c) (Regulation Z requires that "the disclosures shall reflect the terms of the legal obligation between the parties.").

347.    The Truth in Lending Act and Regulation Z both specify how the "amount financed" should be calculated.  (The Act permits the Bureau to use terminology different from the Act if it conveys substantially the same meaning.  15 U.S.C. § 1632(a).)

348.    The Truth in Lending Act provides:

The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1): (i) take the principal amount of the loan or the cash price less downpayment and trade-in; (ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to

section 1605 of this title; and (iii)subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.  15 U.S.C. § 1638(a)(2)(A).

349.    Regulation Z similarly provides:

The amount financed is calculated by (1) Determining the principal loan amount or the cash price (subtracting any downpayment); (2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and (3) Subtracting any prepaid finance charge. 12 C.F.R. § 1026.18.

350.    As authorized by the Truth in Lending Act, Regulation Z requires creditors to separately itemize the amount financed, including "any amounts paid to other persons by the creditor on the consumer's behalf."  15 U.S.C. § 1638(a)(2)(B); 12 C.F.R. § 1026.18.

351.    The Truth in Lending Act defines the finance charge as the

sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. 15 U.S.C. § 1605(a).

352.    Regulation Z similarly defines the finance charge as

the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.  12 C.F.R. § 1026.4(a).

353.    The annual percentage rate "is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 1026.22(a)(1).

354.    However, the Truth in Lending Act and Regulation Z exempt certain loans above a threshold amount that is annually adjusted for inflation, unless they are secured by any real property.  15 U.S.C. § 1603(3); 12 C.F.R. § 1026.3(b)(1)(i).  For example, effective January 1, 2022, the threshold amount was $61,000.  This Count does not apply to loans above that threshold.

**B. Violations**

355.   Dividend is a creditor under 15 U.S.C. § 1602(g) and 12 C.F.R § 1026.2(a)(17) because it regularly made consumer solar purchase loans payable by written agreement in over four installments.  Its loans were payable in 300 monthly installments over 25 years.

356.   Dividend made loans below the threshold amounts that are subject to (and not exempt from) the Truth in Lending Act and Regulation Z.

357.   As described in section V, Dividend imposed a hidden fee as a condition of financing on the loan products it offered to consumers who financed their Power Home Solar purchase through them.

358.   Consumers paid the hidden fees as described in section V.

359.   Power Home rolled the fee into a higher system price, charging loan consumers more than cash consumers as described in section V.

360.   The hidden fees were a finance charge under 15 U.S.C. § 1605(a) and 12 C.F.R. § 1026.4(a): they were paid and payable directly or indirectly by the consumer; they were incident to and a condition of the loan, the extension of credit; they were imposed directly or indirectly by Dividend, the creditor; and these fees did not exist in a comparable cash transaction, a cash purchase from Power Home.

361.   Consumers also had to pay interest accruing on the amount of the hidden fee over the course of the loan term, so many have to pay 25 years of interest on these fees.

362.   The hidden fees do not meet any statutory or regulatory exceptions to the Truth in Lending Act's definition of a finance charge.

363.   The hidden fees or the effect of the fees on the offered interest rate were not disclosed prior to the execution of the loan agreements.

61

364.    Dividend violated 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 1026.18(d) by omitting the hidden fees from the Finance Charge in its Truth in Lending Disclosure Statements as described in section V.

365.    Dividend violated 15 U.S.C. § 1638(a)(2)(A) and 12 C.F.R. § 1026.18(b) by overstating the Amount Financed in its Truth in Lending Disclosure Statements as described in section V.

366.    Dividend violated 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 1026.18(e) by understating the Annual Percentage Rate in the Truth in Lending Disclosure Statements it provided to consumers as described in section V.

367.    Dividend violated 15 U.S.C. § 1638(a)(2)(B) and 12 C.F.R. § 1026.18(c) by overstating the amount it paid Power Home Solar on behalf of consumers in the Itemization of the Amount Financed in their Truth in Lending Disclosure Statements as described section V.

368.    Each of Dividend's violations of the Truth in Lending Act and Regulation Z violates the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), by offering loans that do not comply with federal consumer financial laws.

## C.  Fraudulent Concealment of Fees

369.    Dividend fraudulently concealed the false statements in its Truth in Lending Act disclosures by hiding and omitting its program fees from consumers' sales proposals, from Power Home's purchase agreements, and from its own loan agreements as alleged in Section V.

370.    These non-disclosures hindered the Plaintiff from discovering the facts and elements of the violations alleged in this Count until after Power Home's bankruptcy in October 2022, despite the exercise of due diligence, including the review of consumer contracts, complaints, loan agreements, and Truth in Lending Act disclosures.

**Count III: Deception About Hidden Loan Fees in Violation of the Consumer Financial
Protection Act, 12 U.S.C. § 5536(a)(1)(B)**

371.    Plaintiff realleges paragraphs 1-370.

372.    By hiding its loan fees, Dividend engaged in deceptive acts and practices in
violation of 12 U.S.C. § 5536(a)(1)(B), which provides in relevant part: "It shall be unlawful for
– (1) any covered person or service provider . . . (B) to engage in any unfair, deceptive, or abusive
act or practice[.]" 12 U.S.C. § 5536(a)(1)(B).

373.    As described in section V, the fees were hidden and omitted in sales proposals and
presentations, in Power Home's purchase agreements, in Truth in Lending Act Disclosures, in
summaries of loan terms, and in loan agreements.

374.    As described generally in sections IV.B and O and alleged in Count I, Dividend,
delegated, authorized, and approved the use of sales proposals to sell its loans and present its loan
terms and costs.

375.    The hidden loan fees were material: they misrepresented the purchase price of the
solar system; they misrepresented the loan principal; they misrepresented the actual loan annual
percentage rate and fees; they ranged from 15.5% to 16% of the loan amount (without the fee);
they amounted to thousands of dollars, and in many cases, over $10,000; consumers paid interest
on these fees for the length of the loan term, 25 years; and hiding or omitting fees prevented
consumers from understanding the actual or comparative value and costs of loans and purchases
as described in section V.

**Count IV: Deception about Value, Savings, Costs, and Risks in Violation of the Virginia
Consumer Protection Act, Va. Code § 59.1-200**

376.    Plaintiff realleges paragraphs 1-375.

377.   Virginia Code § 59.1-197 provides that the Virginia Consumer Protection Act is to be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public.

378.   Virginia Code § 59.1-198 defines "consumer transaction" as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

379.   Virginia Code § 59.1-198 defines "supplier" to mean "a seller . . . who advertises, solicits, or engages in consumer transactions."

380.   Virginia Code § 59.1-199 has certain exclusions to the Virginia Consumer Protection Act, including under subdivision (3) "Those aspects of a consumer transaction that are regulated by the Federal Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq." and under subdivision (4) banks, credit unions, and Commonwealth-licensed mortgage lenders.

381.   In part, Virginia Code § 59.1-200 provides:

A.   The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:
   . . .
5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
   . . .
14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]

382.   The sale of residential solar products and residential solar loans are "consumer transactions," as defined in Virginia Code § 59.1-198, because they are goods or services to be used primarily for personal, family, or household purposes.

383.    Dividend is a "supplier" as defined in Virginia Code § 59.1-198 and applied in Virginia Code § 59.1-200 because it was a seller of residential solar loans who advertised, solicited, and engaged in "consumer transactions" as described in sections III.A, IV.A-B, and Count I.

384.    Dividend is not excluded from the Virginia Consumer Protection Act because it was not a bank, credit union, or licensed mortgage lenders from 2021 to October 2022.

385.    As described in section IV and alleged in Count I, Dividend and Power Home's advertising, marketing, and sales practices misrepresented the characteristics, uses, or benefits of solar systems and loans in violation of Virginia Code § 59.1-200 subsection (A)(5).

386.    As described in section IV and alleged in Count I, Dividend and Power Home's advertising, marketing, and sales practices used deception, fraud, false promises, or misrepresentation in violation of Virginia Code § 59.1-200(A)(14).

387.    Dividend willfully engaged in the acts and practices described in this Count in violation of the Virginia Consumer Protection Act.

388.    Individual consumers have suffered losses as a result of these violations of the Act.

**Count V: Deception about Hidden Loan Fees in Violation of the Virginia Consumer Protection Act, Va. Code § 59.1-200**

389.    Plaintiff realleges paragraphs 1-388.

390.    As described in section V and alleged in Count II, Dividend used deception, fraud, false pretenses, false promises or misrepresentations in connection with a consumer transaction by hiding, omitting, and misrepresenting loan fees in violation of Virginia Code § 59.1-200(A)(14). However, this allegation applies only to those loans whose amounts exceed the threshold set by 12 C.F.R. § 1026.3.

391.    Dividend willfully engaged in the acts and practices described in this Count in violation of the Virginia Consumer Protection Act.

392.    Individual consumers have suffered losses as a result of these violations of the Act.

## VII. Prayer for Relief

393.    Wherefore, Plaintiff respectfully requests the Court to enter judgment in favor of the Plaintiff and against the Defendant for the following relief:

394.    As authorized by 12 U.S.C. § 5565(a)(2)(G) and Virginia Code § 59.1-203(A), permanently enjoin the Defendant, its employees, officers, directors, members, managers, agents, successors, assignees, and all other persons acting on its behalf, in concert, or in participation with them, from engaging in any unfair, deceptive, or abusive acts or practices in violation of the Virginia Consumer Protection Act and the federal Consumer Financial Protection Act as alleged in this Complaint.

395.    As authorized by 12 U.S.C. § 5565(a)(2)(G) and Virginia Code § 59.1-203(A), order such other injunctive relief as may be necessary to ensure the Defendant's further compliance with the federal and state laws alleged in this Complaint.

396.    As authorized by 12 U.S.C. § 5565(a)(2)(A), order the loan contracts between the Defendant and Virginia consumers procured by the Defendant's deceptive acts or practices to be void, rescinded, limited, or reformed as necessary to redress injury to affected consumers.

397.    As authorized by 12 U.S.C. § 5565(a)(2)(B) and (C) and Virginia Code § 59.1-205, order the Defendant to pay consumer restitution or refunds to Virginia consumers based on the violations of law alleged in this Complaint.

398.    As authorized by 12 U.S.C. § 5565(a)(2)(D) and (E), order the Defendant to pay disgorgement, compensation for unjust enrichment, payment of damages, or other monetary relief for violations of the Consumer Financial Protection Act.

399.    As authorized by Virginia Code § 59.1-206(A), order the Defendant to pay civil penalties for each separate violation of the Virginia Consumer Protection Act.

400.    As authorized by 12 U.S.C. § 5565(a)(2)(H) and (c), order the Defendant to pay civil penalties for each separate violation of the federal Consumer Financial Protection Act.

401.    As authorized by 12 U.S.C. § 5565(b) and Virginia Code § 59.1-206(C), order the Defendant to pay Plaintiff his attorneys' fees and reasonable costs and expenses accrued in the investigation and prosecution of this action.

402.    Award such other relief that the Court deems just and appropriate.

**COMMONWEALTH OF VIRGINIA,
EX REL. JAY JONES
ATTORNEY GENERAL**


By: _____/s/_____
           Geoffrey L. Ward

Jay Jones
Attorney General

Travis G. Hill
Chief Deputy Attorney General

Helen O. Hardiman
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Chief
Consumer Protection Section

Mark S. Kubiak
Senior Assistant Attorney General and Unit Manager
Charitable Solicitations and Deceptive Conduct Unit

Geoffrey L. Ward (VSB No. 89818)
Senior Assistant Attorney General
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General and Unit Manager
Office of the Attorney General of Virginia
202 N. Ninth Street
Richmond, Virginia 23219
Phone: (804) 371-0817
Fax: (804) 786-0122
gward@oag.state.va.us
ccrenshaw@oag.state.va.us

*Attorneys for Plaintiff*